Estate of Claude E. Dorsey, Sr., Claude E. Dorsey, Jr., and Gladys Dorsey, Executors, et al., [1] v. Commissioner. Estate of Claude E. Dorsey v. Commissioner
Docket Nos. 28771, 28772, 28773, 28774.
United States Tax Court
1952 Tax Ct. Memo LEXIS 60; 11 T.C.M. (CCH) 1032; T.C.M. (RIA) 52307; October 24, 1952
*60 George R. Sherriff, Jr., Esq., 42 Broadway, New York, N. Y., for the petitioners. Thomas C. Cravens, Jr., Esq. and Frank M. Thompson, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in petitioners' income taxes as follows: Docket
No.
Petitioner
Year
Amount
28771
Estate of Claude E. Dorsey, Sr.
1944
$32,176.67
Jan. 1, 1945
to
Mar. 22, 1945
1,374.54
28772
Claude E. Dorsey, Jr.
1944
30,841.57
1945
1,531.17
1946
22,363.43
28773
Gladys Dorsey
1944
31,271.30
1945
1,114.02
1946
22,077.97
28774
Katherine Dorsey
1945
72.95
1946
640.52
The only question is whether, for the years 1944, 1945 and 1946, petitioner Katherine Dorsey is, for tax purposes, to be treated as a partner in the business known as Dorsey Brothers. These cases were consolidated for trial. Findings of Fact Facts stipulated orally by the parties at the trial are hereby found as stipulated. Petitioners in Docket Nos. 28772 - 28774, inclusive, and the decedent whose estate is the petitioner in Docket No. 28771, were residents of Elba, Alabama. Their *61 Federal income tax returns for the years in issue were filed with the collector of internal revenue for the district of Alabama. In 1911 Claude E. Dorsey, Sr. (hereinafter also referred to as "Mr. Dorsey") and his brother, H. A. Dorsey, organized Dorsey Brothers, a partnership. They conducted a Ford automobile agency, selling and servicing automobiles, with establishments at Elba and Enterprise, Alabama. In or about 1926 they dissolved the partnership; H. A. Dorsey individually continued the automobile agency business at Enterprise, and Claude E. Dorsey, Sr. individually continued it at Elba. Late in the 1920's, Claude E. Dorsey, Sr. started to manufacture stump pullers (a device for pulling stumps) and skidders (a device for skidding logs out of swamps and difficult places), and at some time thereafter also made stump dozers (a device for pushing out stumps). The automobile agency was receiving many Fordson tractors, and these devices were developed to create further uses and sales for the tractors. In 1932 the stump puller and skidder business dropped off, and Mr. Dorsey began the manufacture of truck trailers and semitrailers. The trailers and chassis were manufactured with *62 the same facilities formerly used for manufacturing stump pullers and skidders. There were three places at which Mr. Dorsey carried on his business at Elba: the automobile agency, which was changed from a Ford to a Chevrolet agency in 1930, was located in the "Square;" the body shop was about a block away; and the machine shop, about two blocks away. The chassis were built in the machine shop and were then taken to the body shop, where the bodies were erected on the chasis. Later, in 1944, the machine shop and body shop were consolidated in one place. The automobile agency, at a still different location, had nothing to do with the manufacture of trailers, but occasionally some of its employees worked at the manufacturing shops. The business thus conducted by Mr. Dorsey was incorporated in 1932. The incorporation was handled by John C. Fleming, an attorney at law. The stock in the corporation was issued as follows: Claude E. Dorsey, Sr.
5 shares
Gladys Dorsey (his wife)
45 shares
Claude E. Dorsey, Jr. (his son)
50 shares While the business was incorporated, title to at least most of the real estate and tangible property used by the corporation remained in the *63 name of Mr. Dorsey. Mr. Dorsey's son and only child, Claude E. Dorsey, Jr. (hereinafter referred to as "Claude"), began part-time employment with the Dorsey business at Elba, Alabama, in April 1936, and became acquainted with the business. He was going to school at that time. At about the time Claude finished school, in 1937, the corporation was dissolved and a partnership was formed between Mr. Dorsey, his wife Gladys Dorsey (hereinafter referred to as "Mrs. Dorsey"), and Claude, as equal partners. It was known as "Dorsey Brothers". There was no written partnership agreement. The corporation was dissolved and the partnership formed under the advice of Mr. Fleming. The property and business of the corporation, and the property standing in the name of Mr. Dorsey, were transferred to the partnership in 1937. Since 1937, Claude devoted his entire time to the business. His time was divided between the automobile agency and trailer manufacturing business, at both the machine shop and the body shop. Claude was married to his wife, Katherine, in 1936, when she was 21 years old, and thereafter they had one child. Her education consisted of completion of high school and two years of *64 college. Her only business experience prior to 1944 was as office manager of the Livestock Market, at Elba, Alabama. Mr. Dorsey had extensive farming operations, at which he spent much of his time, away from the places of business of Dorsey Brothers. Usually the only chance of consulting with him about the business of Dorsey Brothers was at noon or in the evenings. Claude and Katherine spent much of their time at the home of his parents, where most of the discussions relating to the business of Dorsey Brothers took place. During these discussions, at noon and in the evening, Katherine was usually present. She took part in the discussions, and her opinion was asked as to various matters. Katherine's "participation" in the business of Dorsey Brothers was almost entirely "advisory" and confined to the role she played in these discussions. She went to the office or places of business of Dorsey Brothers only infrequently, and her "advice" was given at home. Her "participation" in the business was essentially the same before and after January 1, 1944, except that after that date the business was expanding and there were more matters to discuss. Her "participation" in the business in *65 this connection reflected the interest of a wife, rather than a business partner, in her husband's affairs. Mr. Dorsey had been a stockholder and director in a bank at Elba, Alabama, which became insolvent and "failed" in 1931. He had given a personal guarantee on a loan to the bank by Federal Government sources, and this resulted in a judgment of $85,000 against him in favor of the Federal Reserve Bank and the Reconstruction Finance Corporation (hereinafter referred to as the "RFC"). Substantially all of this $85,000 was paid by Mr. Dorsey by 1941. In 1943 Dorsey Brothers had an opportunity to obtain Government contracts. In connection with the Burma Road program, the Army Ordnance Department (hereinafter referred to as "Ordnance") wanted Dorsey Brothers to manufacture a large quantity of axles. Performance of these contracts required Dorsey Brothers to add to its facilities and its working capital; it did not have sufficient capital of its own to execute the contracts, and to obtain it would "put an awful strain" on its credit. In 1943, Dorsey Brothers was able to borrow about $40,000 from Federal Government sources. In the Fall of 1943, Mr. Dorsey and Mr. Fleming went to the *66 Federal Reserve Bank at Atlanta to discuss a loan of $1,000,000. Dorsey Brothers then had assets of about $300,000, and there was some indication that the Federal Reserve Bank authorities might regard this amount as insufficient to support a loan of that size. Representatives of the Federal Reserve Bank suggested raising more capital through incorporation of Dorsey Brothers or through addition of another partner. At the end of 1943, and during the years in issue, Katherine owned the following assets: (1) A 160-acre farm, which she inherited from her father, worth about $10,000 at the end of 1943; (2) a residence in which she lived with Claude and their child, worth about $15,000 at the end of 1943; and (3) three lots, each worth about $500 or $600 at the end of 1943. The residence and the lots had been given to her by Claude. At the end of 1943 and the beginning of 1944, Mrs. Dorsey and Claude had substantially no assets other than their interests in Dorsey Brothers, and Mr. Dorsey, in addition to his interest in that business, owned a farm worth about $50,000. At some time prior to January 1, 1944, and possibly in or about 1940, Claude mentioned to Mr. Dorsey that Katherine *67 should be made a partner in Dorsey Brothers. He answered, "Well, we will see". Mr. Dorsey was a very cautious man in his business affairs, particularly since suffering severe financial reverses and losses during the depression. He considered it good business to have relatives in the business rather than outsiders. On several occasions prior to the foregoing trip to Atlanta, Mr. Dorsey and Mr. Fleming had discussed admission of Katherine as a partner, and they discussed it again at the time of that trip. It was also discussed in Atlanta with a representative of the Federal Reserve Bank. The question of the tax effect of Katherine's admission as a partner in Dorsey Brothers was never discussed with Mr. Fleming. But Mr. Dorsey discussed it with his accountant, who pointed out to him "that he would have a tax advantage" through admission of Katherine as a partner. Katherine's father had died when she was quite young, and she had grown up in some financial adversity. Mr. Dorsey knew her background and had an interest in her. He explained to her the possibility of her losing everything if she became a partner, as she would be fully liable for losses. No homestead exemption exists *68 in Alabama for partnership debts. No written partnership agreement was entered into at the end of 1943 or the beginning of 1944. Mr. Fleming advised that such an agreement was unnecessary to formation of a partnership, and that in his opinion the contemplated arrangement would result in a "valid partnership". Martin L. Strickland, a certified public accountant, had performed accounting services for the Dorseys since 1927. His work consisted principally of making annual audits until 1943, and, since that time, monthly financial statements of the Dorseys' business. He had general supervision over, and gave directions concerning, the keeping of the business books. At the beginning of 1944, when Mr. Strickland was present in connection with an audit of the business books for 1943, Mr. Dorsey spoke to him about Katherine and the business and, after some discussion, he was told by Mr. Dorsey to make the necessary entries on the business books to show a gift to Katherine of a portion of the interests in the business of the then partners sufficient to reflect her as an equal partner with a one-fourth interest. Entries to show such a gift were made after the audit for 1943 was completed. *69 Except for this book transfer of capital to her, the books showed no contribution of capital to the business by Katherine at that time. Katherine did not contribute to capital of the partnership any of the assets previously owned by her which were noted above, namely, her farm, her residence, and her lots. Thereafter the books of Dorsey Brothers carried capital accounts for Mr. and Mrs. Dorsey, Claude, and Katherine. One-quarter of the profits of the business at the end of the year was credited to the accounts of each of the persons carried as partners, including Katherine. The entries thus made on the books of Dorsey Brothers indicated a gift, by each of Mr. and Mrs. Dorsey and Claude, of $19,273.72 of their partnership capital, and a gift to Katherine of a capital interest in the partnership amounting to $57,821.16. Federal gift tax returns were prepared by Mr. Strickland and filed by Mr. and Mrs. Dorsey and Claude on or about March 23, 1944, reporting a gift by each to Katherine of $19,273.72 of partnership capital in Dorsey Brothers. At about the same time, Katherine filed donee's returns reporting the same event. Not long after the beginning of 1944, the First Farmers & *70 Merchants National Bank (hereinafter referred to as the "First Farmers Bank") of Troy, Alabama, the Federal Reserve Bank, the RFC, and Ordance were advised that Katherine was a partner in Dorsey Brothers and they were informed as to the assets held by her in her name. The First Farmers Bank was also advised that Katherine was authorized to sign checks drawing on business funds. Individual financial statements, including Katherine's, were submitted to the First Farmers Bank and Smaller War Plants Corporation, a subsidiary of the RFC, in connection with the loan being sought by Dorsey Brothers. There resulted a line of credit, known as a "V Loan", in the amount of $700,000, although $1,000,000 had been sought. An agreement with the First Farmers Bank, dated November 21, 1944, providing for this loan, was introduced in evidence and is incorporated herein by reference; among its provisions were the following: "THIS AGREEMENT, Made this, the 21st day of November, 1944, between the First Farmers & Merchants National Bank of Troy, a corporation, organized and existing under the Laws of the United States of America (hereinafter referred to as "Bank") and Dorsey Brothers, a partnership, *71 composed of C. E. Dorsey, Sr., C. E. Dorsey, Jr., Mrs. Gladys Dorsey and Mrs. Katherine Dorsey (hereinafter referred to as "Borrower"). WITNESSETH: "WHEREAS, Borrower has entered into certain contracts with the United States of America, War Department. * * *
"1. The Bank will establish a line of credit in favor of Borrower in an amount not exceeding $700,000.00 at any one time outstanding; * * * "2. (a) Borrower will transfer, assign and convey to the Bank all moneys due or to become due under said War Production Contracts, above described, and modifications, amendments and supplements thereof; the Borrower agrees to assign all moneys due and to become due, under any War Production Contract that may be obtained by the Borrower during the life of this agreement that are acceptable, to the Bank and the Federal Reserve Bank of Atlanta, as fiscal agent, for financing under this loan agreement. "(b) Borrower will execute a mortgage to the Bank on all of the Borrower's land, buildings, machinery, and equipment used in connection with the manufacture of any item produced under the War Production Contracts, described in paragraph 2-(a) above. "(c) Borrower will assign and *72 pledge to the Bank, life insurance policies in the amount of $25,000.00 each on the lives of C. E. Dorsey, Jr., and J. V. Wright, as security for the repayment of all moneys advanced by the Bank on account of this loan. * * *
"11. Except with the prior written consent of the Bank and Federal Reserve Bank of Atlanta, as fiscal agent, Borrower will not during the life of this loan: * * *
"(c) Permit withdrawals by the partners of the firm for any purpose, in excess of $24,000.00 per annum, other than funds necessary for the payment of unpaid income taxes payable by the partners. (and it is understood that this provision does not supersede the rights and powers of the United States Government with respect to stabilization of amounts of wages, and salaries, but does limit and restrict the actual payments which the Borrower may make on account of such salaries during the life of this agreement). * * *
"16. Borrower does represent and warrant that subsequent to the date of Borrower's balance sheet, as of August 31, 1944, the following facts: * * *
"(b) No withdrawals have been made in addition to the regular salaries to C. E. Dorsey, Sr., and C. E. Dorsey, Jr. *73 , of $1,000.00 monthly each, except for the payment of income taxes due by the partners." * * *
FIRST FARMERS AND MERCHANTS NATIONAL BANK OF TROY By: (Signed) E. E. Anthony L.S. Vice-President and Cashier. DORSEY BROTHERS. By: (Signed) C. E. Dorsey, Jr. L.S. Member of the Firm ATTEST: (Signed) E. P. Murphree ATTEST: (Signed) Price Ringo (Signed) Mary M. Newton This loan had "RFC security" behind it, and it was made primarily on the strength of such "security" and the war contracts, rather than on the strength of other assets of the partnership or of any individual partner. Copies of this agreement were furnished to the First Farmers Bank, the Federal Reserve Bank, the RFC, and Ordnance. This was the first time the business had borrowed this large an amount. The property held by Katherine in her name at that time, described above, was not a significant factor in the procurement or grant of this loan in the amount of $700,000, and the loan would have been made regardless of whether or not she was a partner in the business. On November 21, 1944, Mr. and Mrs. Dorsey, Claude and Katherine executed a mortgage on the plant machinery and equipment of the partnership *74 to secure indebtedness of the partnership to the First Farmers Bank. The mortgage instrument contained the following: "We further represent and declare to the said mortgagee herein, that the title to said real estate herein conveyed, are in our own right, and that the representations herein made as to titles and encumbrances, are so made with the intent and for the purpose of making this loan. * * *" Every time a new contract with the Federal Government was taken on by Dorsey Brothers, there was a need to obtain loans to finance it. The contracts could not have been carried out without these loans. Subsequent to January 1, 1944, Dorsey Brothers executed numerous documents in which Katherine was referred to, and to which she affixed her signature, as one of the partners. These documents included contracts, notes, loan agreements, and other instruments. Katherine was referred to as a partner in various contracts between Dorsey Brothers and the Federal Government. Her signature was required by the RFC, the Federal Reserve Bank, and Ordnance. She also signed renegotiation agreements with the War Department, acting in the purported capacity of a partner of Dorsey Brothers. None *75 of the property owned by Katherine individually was pledged for any of the loans made to the business. On making loans, the banks did not require the pledging of the individual property of any of the partners. Katherine had authority to sign checks drawn in behalf of Dorsey Brothers. From time to time during the years in issue, when Mr. Dorsey or Claude or J. V. Wright, an employee who was later made a partner, were unavailable, Katherine signed checks for Dorsey Brothers. When she signed checks for the business, it was a routine matter in which she exercised no discretion; decisions to issue such checks were made without consulting her, and she never refused to sign them. Mr. Dorsey died suddenly of a heart attack, on March 22, 1945. He had been sick only a few days and had been in good health up to that time. Mrs. Dorsey and Claude were the only next of kin of Mr. Dorsey. On the evening of Mr. Dorsey's funeral, Mr. Fleming came to Mrs. Dorsey's home, at which she and Claude and Katherine were present. In view of the effect of Mr. Dorsey's death on the existence of the partnership, there was considered at that time the question of continuation of the business. It was decided *76 that the business should be continued in partnership form: Mr. Dorsey's interest in the business was to be divided equally between Mrs. Dorsey and Claude; J. V. Wright, for many years a trusted employee of the business and then its sales manager, was to be admitted as a partner; and Katherine's position was to remain unchanged. Thereafter Mr. Fleming consulted, concerning this proposed arrangement for continuing the business, with representatives of creditors of the business, consisting of the institutions and agencies interested under the foregoing $700,000 loan. A draft of a partnership agreement was drawn up and tentatively approved by the creditors. This partnership agreement was then executed on March 27, 1945, by Mrs. Dorsey, Claude, Katherine, and J. V. Wright. It provided as follows: "KNOW ALL MEN BY THESE PRESENTS: That, whereas, Dorsey Brothers, a partnership, having its principal place of business at Elba, Coffee County, Alabama, and which was owned by C. E. Dorsey, Sr., Mrs. Gladys Dorsey, C. E. Dorsey, Jr., and Mrs. Katherine Dorsey, and which said partnership was engaged in the operation of several businesses, to-wit, the Chevrolet business, general automobile repair *77 shop, the manufacture of trailers, stump pullers, skidders and such other articles as they deemed profitable to manufacture, at Elba, Alabama, and one of the partners, C. E. Dorsey, Sr., having departed this life on March 22, 1945, and having left a last will and testament, and his wife, Mrs. Gladys Dorsey, and his son, C. E. Dorsey, Jr., being the only heirs at law and next of kin entitled to distribution in said estate and being the only legatees and devisees under said will, the said Mrs. Gladys Dorsey and C. E. Dorsey, Jr., have this day made and entered into a written agreement agreeing between themselves that said will not be probated and that no administration be had on the estate of C. E. Dorsey, Sr., but that said estate be divided according to the law of descent and distribution and each taking one-half of the one-fourth interest owned by C. E. Dorsey, Sr., in and to said partnership affairs. "1. That, whereas it is the desire and intention of Mrs. Gladys Dorsey, C. E. Dorsey, Jr., Mrs. Katherine Dorsey and J. V. Wright to form a copartnership effective as of this date, March 27, 1945, for the purpose of carrying on the business of operating a Chevrolet automobile agency, *78 general automobile repair shop, the manufacture of trailers, stump pullers, skidders and any other article which it may be deemed profitable in the future to manufacture. "2. That the principal place of business of said partnership shall be Elba, Coffee County, Alabama, and the name under which said partnership shall operate shall be the name of Dorsey Brothers, and said partnership shall continue until the same is terminated or dissolved as hereinafter provided. "3. The interest of said partners in said business and the amount contributed by each to the capital of said partnership by the partners are as follows: "(a) Mrs. Gladys Dorsey shall contribute the amount standing to the credit of her investment account decreased by any personal withdrawals which have been charged to her as of this date in the former partnership of Dorsey Brothers, plus one-half of the amount standing to the credit of C. E. Dorsey, Sr., in his investment account, decreased by all personal withdrawals which have been charged to him as of this date. "(b) C. E. Dorsey, Jr., shall contribute the amount standing to the credit of his investment account decreased by any personal withdrawals which have been *79 charged to him as of this date in the former partnership of Dorsey Brothers, plus one-half of the amount standing to the credit of C. E. Dorsey, Sr., in his investment account, decreased by all personal withdrawals which have been charged to him as of this date. "(c) Mrs. Katherine Dorsey shall contribute the amount standing to the credit of her investment account, decreased by any personal withdrawals which have been charged to her as of this date in the former partnership of Dorsey Brothers. "(d) Mr. J. V. Wright shall contribute no capital but in consideration of 32 years service with the former partnership and future services to be rendered by him, shall participate in the profits and losses to the extent as set out hereinbelow. "4. That the said partners shall participate in the profits and losses of said partnership business in the following proportions: "(a) Mrs. Gladys Dorsey 32 1/2% of the net profits computed after payment of all expenses, including partners' salaries. "(b) C. E. Dorsey, Jr., 32 1/2% of the net profits computed after payment of all expenses, including partners' salaries. "(c) Mrs. Katherine Dorsey 25% of the net profits computed after payment *80 of all expenses, including partners' salaries. "(d) J. V. Wright ten percent of the net profits from the trailer business computed after payment of all expenses, including partners' salaries. "5. That C. E. Dorsey, Jr., is to be general manager of said business or partnership and for his services he shall receive the sum of $1,000.00 per month. That J. V. Wright shall be assistant manager and sales manager for said business or partnership, and for his services he shall receive the sum of $500.00 per month. That Mrs. Gladys Dorsey shall give such of her time and attention as it is necessary and proper in an advisory capacity and in forming the policies of said partnership and for her services she shall receive the sum of $500.00 per month. "That the salary of the general manager and the salary of the assistant general manager and sales manager and the salary of Mrs. Dorsey shall be subject to change or revision at such time as the partners shall determine, having due regard to the profits, income and management of said business and the services contributed by them. "6. The partners shall withdraw none of the profits until such time as the financial condition of the business *81 warrants the withdrawal of such profits and at that time they shall be withdrawn in the same ratio as profits are shared. Before any withdrawals shall be made they shall be consented to by all partners. It is agreed that J. V. Wright shall make no withdrawals of his profits until his net worth in said partnership equals to ten percent of the total net worth of Dorsey Brothers. "7. That withdrawals shall be made from the partnership fund for the purpose of paying income tax and for paying any inheritance tax that might be due and owing on the interest of C. E. Dorsey, Sr., which was inherited from him by Mrs. Gladys Dorsey and C. E. Dorsey, Jr. "8. That upon the death of one of said partners, the surviving partners at their option shall have the right to acquire from the personal representative of the deceased partner the interest of said deceased partner in said partnership, at and for the book value of the interest of such deceased partner in such partnership, such value shall be construed to mean the total value of the tangible partnership property, real, personal and mixed, including accounts receivable, less all partnership liability, but nothing shall be included therein for *82 the good will of said business. "That the foregoing right to purchase on the part of the surviving partners shall inure only to the benefit of Mrs. Gladys Dorsey, C. E. Dorsey, Jr., and Katherine Dorsey, and the interest of J. V. Wright in and to said partnership at his death or on the dissolution of the partnership shall be ascertained and the other partners shall have the right to purchase his interest in said partnership by paying to his estate the book value of his investment as shown by the books of said partnership. "The book value shall be determined and fixed as of the last audit of the books of said business, provided said audit shall have been made within three months prior to the death of said partner. * * *
"10. That the partnership formed this day being known as Dorsey Brothers shall take over and operate all of the partnership properties belonging to the old partnership which was likewise known as Dorsey Brothers; the surviving partners of Dorsey Brothers, the old partnership, and the heirs and next of kin of C. E. Dorsey, Sr., having by proper conveyance on this day conveyed all of the assets, real, personal and mixed of every kind, character and description, *83 together with all contracts owned or standing in the name of the old partnership to the present partnership, which is likewise known as Dorsey Brothers; and the partners hereto assume all obligations, debts, liabilities and contracts of the old partnership known as Dorsey Brothers which was dissolved by the death of C. E. Dorsey, Sr., on March 22, 1945. "It being the purpose and intention of the partners forming the new partnership and using the name of Dorsey Brothers to take the place of the old partnership of which C. E. Dorsey, Sr., was a partner, the new partnership taking over all of the assets of the old partnership and assuming all of the old partnership liabilities. "In witness whereof the said Mrs. Gladys Dorsey, C. E. Dorsey, Jr., Mrs. Katherine Dorsey and J. V. Wright have hereunto set their hands and seals on this the 27th day of March, 1945. "ATTEST: /s/ J. H. LOWERY /s/ J. G. CLARK /s/ GLADYS DORSEY (L.S.) /s/ C. E. DORSEY, JR. (L.S.) /s/ KATHERINE DORSEY (L.S.) /s/ J. V. Wright (L.S.)" Copies of this agreement of March 27, 1945, were sent to the creditors of the business, Ordnance, and other Government offices with which Dorsey Brothers dealt. *84 As of March 31, 1945, the profit and loss accounts on the business books were closed out, and the investment accounts of Mr. and Mrs. Dorsey, Claude and Katherine were credited with one-fourth of the earnings for the period involved. With the execution of this partnership agreement of March 27, 1945, the investment accounts of Mrs. Dorsey, Claude and Katherine were carried over on the books of the business, and the capital interest of Mr. Dorsey was credited equally to Mrs. Dorsey and Claude on the business books of account. Mr. Dorsey's investment account was discontinued, and an investment account was opened for J. V. Wright. No part of the interest in the business shown by the business books to be owned by Katherine, was included as an asset of Mr. Dorsey's estate. Until his death on March 22, 1945, Mr. Dorsey was the real head of the business and directed its operations and affairs. After his death, Claude took his place in this connection. On April 3, 1945, the following instrument was executed by Mrs. Dorsey, Claude and Katherine: "THIS INDENTURE made and entered into on this 3rd day of April, 1945, by and between Mrs. Gladys Dorsey, a widow, C. E. Dorsey, Jr., and Mrs. *85 Katherine Dorsey, as the surviving partners of the partnership heretofore existing under the name of Dorsey Brothers, which partnership was composed of C. E. Dorsey, Sr., C. E. Dorsey, Jr., Mrs. Gladys Dorsey and Mrs. Katherine Dorsey, and which partnership was dissolved by the death of C. E. Dorsey, Sr., which occurred on the 22nd day of March, 1945; Mrs. Gladys Dorsey, a widow, and C. E. Dorsey, Jr., being the sole surviving heirs of C. E. Dorsey, Sr., and as such heirs inherited from C. E. Dorsey, Sr., his one-fourth interest in said partnership of Dorsey Brothers, which was dissolved by the death of C. E. Dorsey, Sr., on March 22, 1945, this conveyance being joined in by Mrs. Katherine Dorsey as the wife of C. E. Dorsey, Jr.; parties of the first part, and the new partnership known as Dorsey Brothers, which was formed on March 27, 1945, and which said partnership is composed of Mrs. Gladys Dorsey, C. E. Dorsey, Jr., Katherine Dorsey and J. V. Wright, parties of the second part, witnesseth: "That the said parties of the first part for and in consideration of the sum of $100.00 and other valuable consideration in hand paid to them by the parties of the second part, the receipt *86 whereof is hereby acknowledged, have granted, bargained and sold and by these presents do grant, bargain, sell and convey unto the said parties of the second part, their heirs and assigns, the following described real and personal property, to-wit: [Then follows a description of all of the real and personal property transferred from the old partnership to the new partnership.] "TO HAVE and TO HOLD the above described property unto the said parties of the second part, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in any wise appertaining and unto their heirs and assigns in fee simple." "In witness whereof the surviving partners of the partnership of Dorsey Brothers and the heirs at law of C. E. Dorsey, Sr., deceased, have caused these presents to be executed under seal on the day and year first above written." ATTEST: /s/ J. D. LOWERY /s/ J. D. LOWERY DORSEY BROTHERS By /s/ GLADYS DORSEY /s/ C. E. DORSEY, JR. /s/ KATHERINE DORSEY As surviving Partners of Dorsey Brothers. /s/ GLADYS DORSEY (L.S.) /s/ C. E. DORSEY, JR. (L.S.) /s/ KATHERINE DORSEY (L.S.) As Sole Heirs at Law of C. E. Dorsey, Sr., Deceased. *87 Prior to the time the foregoing instrument was executed, and prior to Mr. Dorsey's death, no conveyance had been executed, from Mr. and Mrs. Dorsey and Claude, making Katherine a part owner of the real estate used in the business. After the partnership agreement of March 27, 1945, supplemental agreements were entered into between Dorsey Brothers and the Federal Government, in which Dorsey Brothers was referred to as a partnership consisting of Mrs. Dorsey, Claude, Katherine, and J. V. Wright. A supplemental agreement was also entered into with the Federal Government in which the Government assented to transfer, of the contracts between it and Dorsey Brothers prior to Mr. Dorsey's death, to Dorsey Brothers as constituted after his death. This instrument likewise referred to Katherine as being a "partner" in the "partnership", both before and after Mr. Dorsey's death. This agreement was signed, inter alia, by Katherine "as surviving partner of Dorsey Brothers, a dissolved partnership". On March 9, 1946, the following instrument was executed by Mrs. Dorsey, Claude, Katherine, and J. V. Wright to guarantee payment of $3,250,000 borrowed by Dorsey Brothers: "In order to induce *88 First Farmers & Merchants National Bank of Troy, to make a loan or loans, or renewal or extension thereof, to Dorsey Brothers, a Partnership, hereinafter called the 'Debtor', the undersigned hereby unconditionally guarantees to First Farmers & Merchants National Bank of Troy, its successors and assigns, the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor, made by the Debtor to First Farmers & Merchants National Bank of Troy, dated March 9th, 1946, in the principal amount of Two Hundred and Fifty Thousand ( $250,000.00), and Three Million Dollars ($3,000,000.00), with interest at the rate of 4 percentum per annum. Such note, and the interest thereon and all other sums payable with respect thereto are hereinafter collectively called "liabilities". As security for the performance of this guaranty, the undersigned hereby mortgages, pledges, assigns, transfers and delivers to First Farmers & Merchants National Bank of Troy certain collateral, listed in the schedule attached hereto, marked Exhibit 'A', *89 and made a part hereof. The term 'collateral' as used herein shall mean any funds, guaranties, agreements or other property or rights or interests of any nature whatsoever, or the proceeds thereof, which may have been, are, or hereafter may be, mortgaged, pledged, assigned, transferred or delivered directly or indirectly by or on behalf of the Debtor or the undersigned or any other party to First Farmers & Merchants National Bank of Troy or to the holder of the aforesaid note of the Debtor, or which may have been, are, or hereafter may be held by any party as trustee or otherwise, as security, whether immediate or underlying, for the performance of this guaranty or the payment of the Liabilities, or any of them, or any security therefor. * * *
"In case the Debtor shall fail to pay all or any part of the Liabilities when due, by acceleration or otherwise, according to the terms of said note, the undersigned, immediately upon the written demand of First Farmers & Merchants National Bank of Troy, will pay to First Farmers & Merchants National Bank of Troy the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligations *90 of the undersigned. * * *
"The term 'undersigned' as used in this agreement shall mean the signer or signers of this agreement, and such signers, if more than one, shall be jointly and severally liable hereunder. The undersigned further agrees that all liability hereunder shall continue notwithstanding the incapacity, lack of authority, death, or disability of any one or more of the undersigned, and that any failure by First Farmers & Merchants National Bank of Troy or its assigns to file or enforce a claim against the estate of any of the undersigned shall not operate to release any other of the undersigned from liability hereunder. The failure of any other person to sign this guaranty shall not release or affect the liability of any signer hereof." "/s/ C. E. Dorsey, Jr. /s/ Gladys Dorsey /s/ Katherine Dorsey /s/ J. V. Wright Individual Members of the Firm of Dorsey Brothers, a Partnership. "NOTE: Corporate guarantors must execute guaranty in corporate name, by duly authorized officer, and seal must be affixed and duly attested; partnership guarantors must execute guaranty in firm name, together with signature of a general partner. Formally executed guaranty is *91 to be delivered at the time of disbursement of loan." The foregoing guarantee agreement of March 9, 1946, is still in effect. The mortgage for $250,000 referred to therein has been paid. In the following documents Katherine, together with others, also was referred to and treated as a member of the partnership Dorsey Brothers: (1) An agreement of March 9, 1946, between Dorsey Brothers and Smaller War Plants Corporation, in which the former agreed to restricted use of proceeds of the foregoing loans of $3,250,000. (2) Two renegotiation agreements between Dorsey Brothers and the War Department, dated September 25, 1945, and May 23, 1946, respectively. (3)A letter to Dorsey Brothers from RFC, pertaining to a purchase by Dorsey Brothers of surplus property. Starting with the early part of 1944, there were drawing accounts on the books of Dorsey Brothers for Mr. and Mrs. Dorsey, Claude, and Katherine. Profits in the business were closed out at the end of the year in equal amounts to the investment accounts of the persons appearing as partners on the business books. After the death of Mr. Dorsey, the drawing accounts of Mrs. Dorsey, Claude and Katherine were carried over on the books *92 of the business as thereafter constituted. Under the loan agreements entered into by Dorsey Brothers, partners were permitted to withdraw no more than an aggregate of $24,000 per year, other than for payment of their income taxes, without permission of the lenders. The written partnership agreement of March 27, 1945, required that the persons denominated "partners" could not make withdrawals from the business without the consent of all of them. The drawing accounts on the books of the business reflected salaries paid to persons carried thereon as "partners". Prior to Mr. Dorsey's death, he and Claude each received $12,000 a year, and Mrs. Dorsey and Katherine received no salary. Following Mr. Dorsey's death, Claude continued to receive $12,000 a year as salary, and Mrs. Dorsey and Mr. Wright each received $6,000 a year as salary, totalling $24,000 per year. Mrs. Dorsey did not perform any more services after than she had performed prior to Mr. Dorsey's death. Katherine never drew any salary. Other than amounts drawn to pay her income taxes, and an amount of $3,750 used to buy a bond, withdrawals from the business by Katherine were of a comparatively minor character, and were *93 largely for personal and living expenses. Most of the living expenses of Claude and his family were charged to Claude's account during the existence of the partnership. During the years in issue, Katherine reported no income other than that of Dorsey Brothers attributed to her. The following appeared in Katherine's drawing account for 1944: Mar. 9
Collector of Internal Reve-
nue
$ 121.90
31
Cash
20.00
Apr. 13
Collector of Internal Reve-
nue
2,500.00 30
Petty Cash Items
114.48
30
Dorsey Chevrolet Division
37.04
May 11
Life Magazine
4.50
31
Petty Cash Items
186.10
31
Dorsey Chevrolet Division
19.33
June 13
Collector of Internal Reve-
nue
2,500.00
30
Petty Cash Items
146.20
30
Dorsey Chevrolet Division
5.28
July 7
Sears. Roebuck & Company
12.79
18
International Readers
League
14.50
31
Petty Cash Items
46.68
31
Dorsey Chevrolet Division
81.87
Aug. 3
Edmonds Smart Style Shop
11.12
3
Tonge's, Inc.
17.29
31
Petty Cash Items
192.50
Sept. 14
Collector of Internal Reve-
nue
25,000.00
9
Redbook Magazine
4.00
30
Petty Cash Items
188.28
30
Dorsey Chevrolet Division
1.98
Oct. 2
Ideal Dress Company
9.41
7
Rosenberg Brothers
11.15
7
Douglas Brothers
42.47
7
Loveman, Joseph & Loeb
61.63
7
Blumberg & Sons
47.66
17
Better Homes & Gardens
3.00
7
Dr. J. O. Colley, Jr.
10.00
31
Petty Cash Items
218.50
31
Dorsey Chevrolet Division
3.52
Nov. 2
Martin Merc. Co.
22.47
3
Nachman & Mertief
36.85
30
Petty Cash Items
206.20
30
Dorsey Chevrolet Division
12.50
30
Dorsey Chevrolet Division
13.75
Dec. 28
Collector of Internal Reve-
nue
100,000.00
31
Petty Cash Items
202.20
31
Group Hospital Insurance
13.20
5
Ideal Dress Shop
3.04
16
Check
3,750.00
22
Check - 1/4 of $2,000.00
Christmas gift to J. V.
Wright
500.00
22
Broadnox Jewelry Com-
pany
153.00
27
W. T. Whitman - Tax Col-
lector
75.40
31
Dorsey Chevrolet Division
4.40
Total
$136,626.19
Less Credit for Use of
Car
80.76
Balance to Investment Ac-
count
$136,545.43
*94 Dorsey Brothers was discontinued as a partnership by April 1, 1946, and the business was continued after that date in the form of three corporations, named Dorsey Brothers Chevrolet, Inc. (hereinafter referred to as "Dorsey Chevrolet"), Dorsey Trailers, Inc. (hereinafter referred to as "Dorsey Trailers"), and Elba Investment Company (hereinafter referred to as "Investment"). All the assets of the partnership were transferred to one or more of these corporations. Dorsey Trailers manufactured trailers; Dorsey Chevrolet carried on the automobile agency; and Investment held title to the real estate, buildings and machinery used by Dorsey Trailers. In 1948 Investment merged with Dorsey Trailers, which thereafter owned the property then held by Investment. In the early part of 1946, there was a transfer on the books of Dorsey Brothers of $30,000 from the investment account of Katherine to the investment account of Claude. This transfer was made at Claude's direction and without Katherine's knowledge or assent. This reduction in Katherine's interest in the business as shown by the business books was not a loan or a gift by her to Claude. Claude directed reduction of Katherine's interest *95 in this manner to try to "even up the investment accounts before we issued stock for them". The amounts in the drawing accounts on the business books had become disproportionate because of the substantial withdrawals by Claude and the other partners, and the smaller withdrawals by Katherine for purposes other than payment of income taxes. The foregoing reduction in Katherine's interest in the partnership, as shown by the business books, reflected the existence of at least substantial control in members of the Dorsey family other than Katherine over the interest in the partnership which purportedly had been given to her in 1944. That control, in persons other than Katherine, existed in 1944, 1945 and 1946. Through the exercise of that control, she might be deprived of part or all of the interest thus given to her. Thereafter, at some time prior to April 1946, $9,110.93 was transferred on the business books from Claude's investment account to Katherine's investment account. Katherine was no more familiar with this transfer than she had been with the earlier reduction of her book interest by $30,000. The books of Dorsey Brothers carried the following capital interests as of March 31, 1946: *96 Claude
Mrs. Dorsey
Katherine
J. V. Wright
Balance - Trailer Division 3/31/46
* $114,533.57
$100,053.27
$46,886.72
$9,019.52
Balance - Chevrolet Division 3/31/46
21,374.06
21,374.06
14,249.36
Adjustment - Chevrolet Division
92.75
92.75
61.83
Total
136,000.38
121,520.08
61,197.91
9,019.52
Add Renegotiation Adjustment
1,252.97
1,562.82
1,440.52
830.44
Transfer from Claude's account to Kath-
erine's
* (9,110.93)
9,110.93
Total
128,142.42
123,082.90
71,749.36
9,849.96
Percentage
38.50
36.98
21.56
2.96
The stock in each corporation thereafter was issued to the indicated persons as follows: Dorsey
Investment
Dorsey Trailers
Chevrolet (Shares
(Shares at $1.00 par)
(Shares at $20.00 par)
at $100.00 par)
Claude
71,450 Shs.
2,187 1/2 Shs.
200 Shs.
Mrs. Dorsey
68,250 Shs.
2,250 Shs.
200 Shs.
Katherine
35,000 Shs.
1,187 1/2 Shs.
200 Shs.
J. V. Wright
625 Shs.
Sam Rowe
100 Shs.
Price Ringo
100 Shs.
Ed White
100 Shs.
Total
175,000 Shs.
6,250 Shs.
600 Shs.
*97 Katherine was Secretary-Treasurer of one or more of the corporations formed to succeed the partnership. No salary was paid to Katherine after incorporation of the business. From time to time after the incorporation, she signed checks, payrolls, and certain documents; in doing this, as prior to the incorporation of the business, she exercised no discretion of her own but acted in a routine manner to carry out decisions made by other persons. The stock issued by Dorsey Trailers and Dorsey Chevrolet was deposited with the First Farmers Bank to secure their indebtedness to that bank. No dividends have been paid on the stock of the corporations because loan terms prohobited payment of dividends until the indebtedness had been paid, and all the profits after taxes were applied in reduction of the indebtedness. In March 1945 there was agitation to organize the workers at the Dorsey trailer plant. The opinion of the Dorseys was that the plant was not large enough to warrant a labor organization. But in the Fall of 1945, after Mr. Dorsey's death, a contract was signed with a union. Before the end of 1945, the union filed grievances against Dorsey Brothers based on a claim that employees *98 had been laid off without regard to seniority. The dispute was arbitrated in accordance with the contract, and there resulted an award against the business of about $60,000. It was felt that the business could not stand payment of the award, and it was decided to attempt to make a settlement with each one of the employees involved individually of whom there were between 50 and 75. Thereafter investigation was made to find out to what extent each of these employees had been employed elsewhere during the period of the supposed lay-off. Amounts thus earned elsewhere were deducted from the employee's claim against the business. An effort was also made to contact the employees individually and to induce them to settle their claims. Of all the persons engaged in the effort to reduce and settle the claims of these employees, Fleming was the most active. Claude was also active, and Mrs. Dorsey and Katherine participated to some extent. As a result of this effort, the claims of some 50 or 60 employees were settled, so that, instead of paying about $60,000 under the arbitration award, Dorsey Brothers was able to settle for an aggregate sum of about $10,000. There was a strike at the plant *99 of Dorsey Trailers in October or November of 1946, causing the plant to be closed for several months. The union filed charges with the National Labor Relations Board, and subsequently the matter was reviewed in court. In the course of this dispute consultations and discussions were held with various persons. At some of these, Katherine was present and expressed her views. The various "advisory" services rendered by Katherine to Dorsey Brothers, during the years in issue, and the part she played in the company's labor difficulties were not a material factor in the operation of the business. The services rendered by Katherine prior to 1944, and such services as it was then anticipated she might render thereafter, were not, and were not considered by Mr. and Mrs. Dorsey and Claude to be, a material factor warranting a gift to her of a bona fide, irrevocable interest as a partner in Dorsey Brothers. Federal and state (Alabama) partnership returns were filed by Dorsey Brothers for the calendar year 1944; for the period January 1, 1945, to April 1, 1945; and for the fiscal year ended March 31, 1946. These returns reflected, as partners in the business, those persons who were carried *100 on the business books as partners, including all of the petitioners herein. These returns reflected the distributive shares in the partnership net income attributed to these persons. For each of these persons there were also filed individual income tax returns, Federal and state, in which were reported the respective distributive shares thus shown on the partnership returns; and for each of these persons there were paid the appropriate taxes on those distributive shares for the years 1944, 1945 and 1946. Respondent determined that Katherine had not been a partner, for tax purposes, in Dorsey Brothers during the years in issue, and determined the income tax liability of petitioners accordingly. Petitioners allege it was error for respondent to include, in the income of petitioners other than Katherine, the share of the distributive partnership income attributed to her pursuant to the books and tax returns of the business. On March 15, 1950, "protective" claims for refund were filed by Katherine covering taxes paid upon the distributive share in the partnership income attributed to her for each of the years 1944, 1945 and 1946. The 1946 claim for refund was filed at the suggestion *101 of a letter of March 6, 1950, addressed to Katherine, by an internal revenue agent. It was not the intent of Mr. and Mrs. Dorsey and Claude prior to March 22, 1945, and of Mrs. Dorsey and Claude after that date, to join with Katherine in good faith and for business purposes as partners in carrying on the business known as Dorsey Brothers. Opinion RAUM, Judge: This is another case in which related taxpayers carried on a business in partnership form, and in which the question is whether there was sufficient substance behind the form so that one of them is to be recognized as a partner who may be charged with an aliquot share of the business income for purposes of the Federal income tax. It is contended that Mr. and Mrs. Dorsey and their son Claude gave his wife, Katherine, portions of their own interests in the partnership, Dorsey Brothers, sufficient to confer on her a one-quarter ownership of the business as a full-fledged partner. The validity of that contention is to be tested by the standards laid down by the Supreme Court in the ), ), and ) cases, which call for inquiry *102 whether, on all the evidence, Mr. and Mrs. Dorsey and Claude really and truly intended in good faith to join with Katherine as business partners in the present conduct of the enterprise. . We find, considering all the evidence bearing on the true intent of the parties, that Katherine does not qualify as a partner in Dorsey Brothers for income tax purposes. The evidence convinces us, first, that she did not render services to the business which were significant in its operation. The evidence fails to show that, either by education or experience, she had any training in the sale or servicing of automobiles or in the manufacture and sale of trailers or other products in which Dorsey Brothers dealt during the years in issue. Her only prior business experience appears to have been as office manager in a livestock market; but she very seldom went to the office of Dorsey Brothers and there is no showing as to how that experience was applied in behalf of Dorsey Brothers. Her "services" were almost entirely "advisory" in nature, consisting principally of "participation" in discussions at home and in the presence of the other Dorseys. While we accept as a fact *103 that to some extent she expressed opinions at these discussions, the evidence fails to convince us that her opinions were of any importance in shaping business policy or in affecting its operation. She also signed various documents as a partner, as well as business checks and payrolls. Here, however, she acted purely in a mechanical fashion, exercising no discretion of her own, and carrying out decisions made by other persons. That she was required by various institutions and organizations to sign certain documents in which she was referred to as a "partner", is not surprising and far from indicates that she was more than a partner in form only; the evidence suggests that these parties were not concerned with and did not investigate the reality of her standing as a partner, since they could amply protect themselves through the simple precaution of including her among the partners. Petitioners further stress the part Katherine played in connection with labor controversies involving the business. Her services on this score may have been of some value to the business, but we do not believe that her views were of significance in fixing business labor policy or that her services were of *104 real importance in bringing those controversies to a close. Moreover, as we think was true of all her "services" to the partnership, what she did here indicates to us that she acted not as a business partner but as a wife and a member of a family interested in an important business in a small community. Her husband, Claude, when asked "Do you think she would have done these same things she did just because she was a partner or not, just because she was your wife?", replied "She would have." We find that such "services" as she rendered the partnership were performed as a wife and not a business partner. Secondly, petitioners contend that Katherine's personal assets were a factor inducing her admission to the partnership. However, if the evidence reasonably indicates anything, it is just the contrary. Katherine purportedly was made a partner at the time the business was seeking a million dollar loan. The business had assets of about $300,000, and Mr. Dorsey's personal assets amounted to about $50,000. Katherine's personal assets at that time were worth about $26,000. Although the business failed to get a loan in the amount sought, after Katherine's alleged admission a loan for $700,000 *105 was obtained. Petitioners would have us believe that, with an asset pool of $350,000 which creditors of the business might reach, addition of a mere $26,000 made possible a loan of $700,000. This is so implausible as to be little short of preposterous on the evidence before us. Nor can we believe that Katherine's personal assets of $26,000 played a part in the later borrowing by the business of $3,250,000. If in fact, apart from Katherine's assets, the foregoing asset pool was not sufficient to support loans of the magnitude involved, those loans were granted because of the additional circumstances that Dorsey Brothers had Government contracts of considerable value; the proceeds of the loans were to be used in execution of those contracts; and the Government, in a fashion not made completely clear by the evidence, protected the lending institution. It is plain enough to us that Katherine's personal assets were unimportant in procurement of funds by the business through borrowing, and there is nothing in the evidence to lead us to believe that there was any other respect in which they were significant in the financial operations of the business. We assume that the capital contribution *106 of a partner need not originate with him but may be derived through a gift. We find, however, that on the evidence before us there was not such a gift of capital as to entitle Katherine to treatment as a partner for income tax purposes. The alleged gift of a partnership interest to her in 1944 amounted to about $58,000. Yet in 1946 her husband, Claude, reduced her partnership interest by $30,000, without her knowledge or her assent. So far as the evidence goes, there is nothing to show that Claude needed her consent to make such a substantial reduction in her interest. This, for Claude, was merely "another one of those things I forgot to tell her." Purportedly he did it to "even up the investment accounts before we issued stock for them". Regardless of whether or not this was his purpose, the incident proves to us that there was not a partnership interest given to her which was subject to her dominion and control and of which she could not be deprived in whole or in very substantial part by the donors, and that such ties to that interest remained in the donors as to bar treatment of Katherine as a partner on the basis of that interest. Subsequently some $9,000 was restored to Katherine's *107 interest in the partnership, but this step was also taken at Claude's direction and apparently without her knowledge and without any indication that her consent was needed in altering her interest, and we regard this as further proof that a gift sufficient for tax purposes had not been made. Our conclusion is supported in addition by the evidence as to the comparatively minor extent to which she enjoyed and controlled income from the business. For the most part, except for funds taken to pay her income tax, her withdrawals of profits from the business were far less substantial than those of her husband, and her income tax liability for the years in issue was due entirely to earnings of the business attributed to her. The unbalance in partnership interests, to which Claude referred as the occasion for reducing Katherine's interest by $30,000, was admitted by him to have been due to Katherine's moderation in making withdrawals from the business while Claude, and the other partners as well for all the evidence shows, were drawing monies from the business in considerable amounts for purposes other than satisfaction of their tax liability. Salaries were paid the partners in the aggregate *108 amount of $24,000 annually; yet Katherine never shared in these payments, and never received a salary from the business. We recognize, as petitioners point out, that withdrawals from the business were subsequently restricted by the loan agreements entered into to obtain funds. But taking into account the withdrawals for the entire period, we regard it as more than a fortuitous circumstance that persons other than Katherine achieved substantial drawings from the business while she benefited but little from the business income attributable to the capital interest of which she was supposedly the owner. We note, finally, that Katherine herself was not called as a witness by petitioners; nor did petitioners even suggest that she was unavailable for this purpose. A large part of the testimony by other persons as to her contribution and relation to the partnership was characterized by generality and vagueness, failing to show exactly even when she allegedly became a partner in 1944 or when or how she then acquired title to a portion of the partnership assets, [2] and we are entitled to assume that she would have been called as a witness if the evidence could have been clarified in petitioners' *109 favor through her testimony. She was, after all, the person centrally involved, and the deliberate choice not to expose her to cross-examination in relation to, among other things, the precise character of the "services" alleged to have been rendered by her is a circumstance that cannot lightly be dismissed. The burden of proof was upon petitioners and whatever inferences may be drawn from Katherine's failure to testify must be deemed to weigh against petitioners' position. Although there are some facts in the record which may be marshalled in an effort to give color to the alleged bona fides of Katherine's position as a genuine partner, we think that the facts as a whole point in the other direction. We have seen and and heard the witness, and our conclusion, based on the entire record, is that she was not a bona fide partner. True, the record seems to suggest that Mrs. Dorsey knew *110 no more about the business and made no greater contribution to it than Katherine, and that there might be some incongruity in the Commissioner's attack on Katherine's standing while at the same time not questioning that of Mrs. Dorsey. However, Mrs. Dorsey's situation is not before us, and the proof does not enable us to express an opinion about it, especially since we do not have all the facts pertaining to her initial acquisition of an interest in the business. Katherine's situation is to be judged on its own merits, and considering all the facts - "the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony * * * the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent" [3] - we find that Mr. and Mrs. Dorsey and Claude did not in good faith really and truly intend to join with Katherine as a partner in carrying on the business known as Dorsey Brothers.
Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Claude E. Dorsey, Jr.; Gladys Dorsey; and Katherine Dorsey.↩
*. Balance included $30,000.00 transferred on the books from Katherine's account to the account of Claude 1/31/46, $9,110.93 of which was later credited back to Katherine.↩
2. Some of the assets of the business consisted of real estate and the record fails to disclose that there was any conveyance of any interest in real estate to Katherine in 1944, which she could in turn contribute to the partnership. Thus, it is highly doubtful even whether the forms were observed.↩
3. Cf. .↩